UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DEBRA QUINN,

                Plaintiff,

    v.

CITY OF VANCOUVER, et al.,

                Defendants.

CASE NO. C17-5969 BHS

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Eric Holmes's ("Holmes")

motion for summary judgment, Dkt. 100, Defendants Bronson Potter ("Potter") and

Jonathan Young's ("Young") joint motion for summary judgment, Dkt. 102, and

Defendant the City of Vancouver's ("City") motion for summary judgment, Dkt. 107.

The Court has considered the pleadings filed in support of and in opposition to the

motions and the remainder of the file and hereby grants the motions in part and denies the

motions in part for the reasons stated herein.

## I. PROCEDURAL HISTORY

On November 21, 2017, Plaintiff Deborah Quinn ("Quinn") filed a complaint

against the City, City Manager Holmes, City Attorney Potter, and Chief Assistant City

Attorney Young (collectively, "Defendants") asserting causes of action for sex discrimination in violation of federal and state laws, retaliation in violation of federal and state laws, violation of her First Amendment right to free speech, outrage, negligent supervision, breach of implied contract, and violation of her Fourteenth Amendment right to equal protection. Dkt. 1. Quinn's claims against Holmes, Potter, and Young are in both their individual and official capacities. *Id.*

On April 25, 2019, the City filed a motion to dismiss. Dkt. 74. On June 12, 2019, the City filed a motion to disqualify Quinn's counsel. Dkt. 109. Also on June 12, 2019, Holmes filed a motion for summary judgment, Dkt. 100, Potter and Young filed a joint motion for summary judgment, Dkt. 102, and the City filed a motion for summary judgment, Dkt. 107. On July 8, 2019, Quinn responded to each of the three motions for summary judgment. Dkts. 126, 127, 128. On July 12, 2019, Defendants replied to Quinn's responses to their motions. Dkts. 133, 134, 135. On August 8, 2019, the Court denied the City's motion to dismiss and denied the City's motion to disqualify Quinn's counsel. Dkt. 142.

## II.   FACTUAL BACKGROUND

On April 18, 1993, the City hired Quinn as an Assistant City Attorney.  Dkt. 1, ¶ 9. Quinn worked on labor and employment matters. Dkt. 92, Declaration of Debra Quinn, ¶ 3.

**A.   2010 to 2013**

In 2010, Holmes became City Manager. Dkt. 126 at 2. Quinn testified that the City government's culture began to deteriorate on gender diversity and discrimination issues

in 2010 or 2011. Dkt. 129-1, Deposition of Debra Quinn, at 163.[1] For example, Quinn testified that the City "stopped consistent harassment diversity training, we stopped our diversity committee, committees that we had, we stopped employee get-together functions that, similar functions that we had previously." *Id.* at 164. Quinn also testified that whether these events occurred was within Holmes's control in his position as City Manager. *Id*. at 485. Without employer-sponsored diversity events, female City employees had to seek space in the public library to continue their support group. *Id.* at 176. At some point, during an all-staff meeting, Holmes referred to the idea of diversity as either a shiny object or a shiny ball. *Id.* at 200. Quinn was not present at the meeting but testified that three other City employees, Monique Coleman ("Coleman"), Lee Lofton ("Lofton"), and Terry Rodriguez told her about the statements. *Id.* at 486. Quinn testified that Coleman and Lofton, who are African-American, told her they were very offended by Holmes's statement. *Id*. at 487.

In 2011, Young was hired as an Assistant City Attorney. Dkt. 126 at 2. Young declared that between June 2011 and March 2013, he worked as the City's lead civil litigator, and in March 2013, became lead civil counsel for the Vancouver Police Department. Dkt. 105, Declaration of Jonathan Young, ¶ 4. In 2013, Potter was hired as Chief Assistant City Attorney from outside the City Attorney's office. Dkt. 126 at 2. Potter was hired by then-City Attorney Ted Gathe ("Gathe"). Dkt. 102 at 2. In December

---

[1] When referring to a deposition transcript contained within an exhibit, the Court refers to the deposition transcript page numbers in order to maintain consistency across party exhibits. Otherwise, the Court refers to ECF page numbers.

2013, Alison Chinn ("Chinn"), a City employee, told Quinn that she had heard Potter refer to another female staff member as "the one with the big tits" (the "December 2013 comment"). Dkt. 1, ⁋ 14; Dkt. 129-1 at 267. Quinn testified that there were "many, many conversations that [were] widespread throughout the City and even the County that Mr. Potter had made that comment." Dkt. 129-1 at 269. Quinn testified that at this point, neither Quinn nor Chinn went to HR due to fear of retaliation. *Id*. at 267. Quinn testified that at some point between the December 2013 comment's occurrence and November 2015, she talked to Young about "these statements that [Potter] had made" and Young told her he had talked to Holmes "and that they both had decided that they would take care of it." *Id.* at 263.[2] Quinn also testified that she was told that Young spoke to Potter about the comment at some point between its occurrence and the spring of 2015 but that she understood Young never went to HR. *Id.* at 268.

**B.    2014**

In mid-2014, Potter became City Attorney following Gathe's retirement. Dkt. 126 at 2; Dkt. 102 at 2. Potter testified that he understands the City Manager's decision to hire the City Attorney has to be confirmed by the City Council, but otherwise, the City Manager holds all authority to hire and fire employees of the City. Dkt. 103-5, Deposition of E. Bronson Potter, at 74–75.

---

[2] It is unclear if this testimony refers to a conversation that happened after the December 2013 comment and before the two comments which occurred in mid-2015 or to a conversation that happened after all three comments had been made.

Quinn testified that an incident occurred in a meeting in August 2014 where she felt that she was called out on something by Potter, but Young was also involved and was not called out. Dkt. 129-1 at 102, 219.[3]

In October 2014, the Chief Assistant City Attorney position was open following Potter's promotion. Dkt. 1, ¶ 15. Quinn applied for the position and was the only woman interviewed. *Id*. Quinn had worked for the City longer than anyone else in the applicant pool. *Id*. The interview stage of the application process consisted of interviews with two panels, one "comprised primarily of the City Attorney's Office staff" which preferred Quinn, and another, "consisting solely of male members of the management leadership team (MLT)" which "did not rank [Quinn] highly." *Id*. Quinn alleges that "[b]efore the MLT panel made their recommendation, [Potter] made sexist and derogatory comments about [Quinn] to the panel and discouraged them from selecting her." *Id*. Quinn testified that Chief Molina, a member of the MLT panel, told Quinn that Potter told the panel something to the effect that the other panel was going to support Quinn and the MLT

---

[3] Quinn testified that she reported the comments Potter made at this time to Suzi Schwabe, the H.R. Director, Dkt. 129-1 at 102, but argues that the City has claimed the details of this incident are privileged, Dkt. 127 at 4. Quinn also testified that Potter made further harassing comments she felt were directed at her in a meeting in October 2015 and in an email to her in mid-2015, for a total of three incidents. Dkt. 126 at 4 (citing Dkt. 129-1 at 95–96, 98, 218–20). Quinn explains that she has not "revealed their contents" because the City claims the comments are privileged. *Id*. at 4. However, it is the nonmoving party's burden to present specific, significant probative evidence to defeat summary judgment. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Quinn has failed to describe these instances with sufficient clarity such that the Court may disambiguate them from other events described, understand whether they pertain to harassment based on gender, another protected basis, or an unprotected basis, or otherwise contextualize them. Moreover, Quinn has not argued that she expects to win an exception to the attorney-client privilege asserted (such as through the civil fraud exception, *see Cedell v. Farmers Ins. Co. of Wash.*, 176 Wn. 2d 686, 699–700 (2013) (en banc)) such that the Court may reasonably expect a jury to be able to hear about these comments at trial. Therefore, the Court does not rely on these occurrences in this Order.

panel needed to be united against that. Dkt. 129-1 at 386. Potter testified that after the

MLT panel heard interviews, each member of the panel gave their input. Dkt. 103-5 at

169–72. Potter testified that he expressed his opinion to the panel that Dan Lloyd

("Lloyd"), another Assistant City Attorney, would be a better candidate than Quinn. *Id.*

Potter testified that he told the MLT panel he agreed with opinions which had been

expressed that Lloyd's legal abilities were stronger than Quinn's, Quinn's interview

answers seemed shallow, and Lloyd was a stronger candidate. *Id.* at 171–72. The MLT

panel recommended Lloyd over Quinn. Dkt. 102 at 3.

Holmes testified that primary authority to hire and fire employees at the City was

vested in him by the City charter, the municipal code, and the administrative policies.

Dkt. 101-1, Deposition of Eric John Holmes, at 99–100. Potter testified that when he

hires a Chief Assistant in the civil division, that decision involves "a fair amount of

consultation with Mr. Holmes." Dkt. 103-5 at 75. Potter testified that due to the panels'

conflicting recommendations, he began to consider hiring Young, and he testified that he

believes he told Holmes and City Human Resources ("H.R.") Director Suzi Schwabe

("Schwabe") about his intent to hire Young. *Id.* at 173–75. Holmes testified that when

Potter consulted with him, Holmes expressed his concern that in his experience with

Quinn she did not "consistently provide thorough and sound legal advice that also

supported the client meeting their objectives." Dkt. 101-1 at 154. Potter then offered the

position to Young, who had not applied for the position and had served on one of the

interview panels. Dkt. 1, ¶ 16. Quinn testified that she believed she was better qualified

than Young because she had substantially more legal experience with the City (both in

subject matter and in duration), knew many City employees well, and was already doing the budget for the City Attorney's Office, which was typically the responsibility of the Chief Assistant City Attorney. Dkt. 129-1 at 533–34.

Quinn alleges that Potter wanted to position Young to take Potter's place as City Attorney when Potter retired. Dkt. 1, ¶ 16. Quinn also testified that at some point, Potter told her that whomever he appointed would be the next City Attorney, or that he wanted that person to become the next City Attorney. Dkt. 129-1 at 220. Quinn also testified that the incident in August 2014 was one of the factors leading her to believe that Potter sought a male candidate for the Chief City Attorney position. *Id.* at 219.

Potter declares that Young "addressed the topic of the 2013 comment" with him in October 2014. Dkt. 104, Declaration of Bronson Potter at 2. Young testified that this took place on October 31, 2014. Dkt. 103-8 at 109.

**C.    2015**

Quinn testified that in spring 2015, Schwabe asked Quinn about Potter's December 2013 comment, and Quinn confirmed to Schwabe that Chinn had told her Chinn had heard the comment at the time it occurred. Dkt. 129-1 at 267. Quinn testified that in late spring 2015, she had a conversation with Potter about his comment. *Id.*

In summer 2015, the City terminated a female Assistant City Attorney named Suzanne Lampkin ("Lampkin") who had worked in the criminal division of the City Attorney's Office. Dkt. 126 at 6; Dkt. 104 at 4. Quinn worked on the Lampkin matter as part of her employment law responsibilities for the City. Dkt. 104 at 4. Quinn testified that she began taking notes about the City's treatment of female employees in September

2015. Dkt. 129-1 at 262. In October 2015, a female attorney whom Potter had recruited

resigned her position. Dkt. 1, ¶ 17. During a meeting Quinn participated in with Potter

and Young about Lampkin's case, Potter referred to the female attorney who had

resigned as a "bitch" (the "bitch comment"). *Id.* Referring to Lampkin, who had had

cancer and wore a wig as a result of her cancer treatment, Potter commented either that

he needed to "go put his wig on" or that he would be willing to throw in a wig as part of

her termination agreement (the "wig comment"). *Id.*; Dkt. 129-1 at 199, 407. Quinn

testified that Potter also commented at some point that any hiring decisions had to be run

past "Debra and her girls in HR" and at another point stated that "[Quinn] won't let you

hire anyone under the age of 50" or possibly "[hire] anyone who's not a woman under the

age of 50." Dkt. 129-1 at 233. Quinn testified that when she spoke to Young about the

bitch comment and the wig comment shortly after they occurred, she told him she was

not planning to report the comments to H.R. because she was "1000%" afraid of

retaliation. *Id.* at 408. Young "told [Quinn] he didn't even hear [the bitch comment]

because it's just so commonly said in the workplace." *Id.* at 199–200, 407. Quinn

testified that Young told her he would report the comments to Holmes, *id.*, and alleges

that Young later told her that he had reported to Holmes. Dkt. 1, ¶ 17. Young testified

that on October 14, 2015, he told Quinn that he had talked to Holmes. Dkt. 103-8 at 63.

Quinn alleges that at some point she did report the "bitch" and "wig" comments to H.R.

Dkt. 1, ¶ 17.

Potter declared that at some point in October 2015, Quinn failed to provide him

effective legal advice on the Lampkin matter and that Young told him Quinn had

"admitted to him that she had made a mistake." Dkt. 104, ¶ 5. Young declared that "[o]n or about October 9, 2015, Ms. Quinn told him that she had 'missed an issue' when providing some legal advice to Mr. Potter and that he seemed upset by it." Dkt. 105, ¶ 9. Young declared that Quinn "appeared visibly upset; [Young] encouraged her to take responsibility for the mistake and learn from it, and [Young] stated that [he] had missed the issue as well." *Id*. Young declared that after this conversation, Quinn "had denied any responsibility for the error to Mr. Potter and seemingly blamed [Potter] for it." *Id.* ¶ 10. Potter declared that because Young told him Quinn had admitted making the mistake, Potter "was surprised and concerned when she told [Potter] that she had made no mistake but had tried to tell [Potter] something different than what she actually told [Potter]." Dkt. 104 at 5.

On November 4, 2015, Quinn met with Holmes, Schwabe, and Coleman on issues including whether the City should hire outside counsel to investigate Lampkin's termination. Dkt. 126; Dkt. 129-1 at 512. Quinn argues that at this meeting she told Holmes and Schwabe that she was concerned that discriminatory comments Quinn had heard Potter make were potentially material to the Lampkin matter. Dkt. 126 at 7.[4] Quinn testified that Holmes told her to hire Bob Christie ("Christie") as an outside investigator. Dkt. 129-1 at 553. Holmes told Quinn he would tell Potter that he had been the one to make the decision to hire Christie. Dkt. 126 at 7; Dkt. 129-1 at 553–43.

---

[4] Quinn does not specify the content of Potter's comments because the City argues these comments are protected by an unwaived attorney-client privilege but does specify that these comments were discriminatory. Dkt. 126 at 7.

On November 5, 2015, Quinn met with Potter and Young regarding the Lampkin matter. Dkt. 126 at 7. Potter declared that at this meeting Quinn was in her capacity as legal counsel to the City and to Potter and Young. Dkt. 104 at 5. Quinn testified that it was evident to her that at the meeting Holmes had not informed Potter of his decision to hire Christie. Dkt. 129-1 at 554. Quinn argues that this lack of communication put her "in a very difficult position because apparently now she would have to be the one to inform Potter, and she was very fearful that Potter would be angry with the decision and retaliate against her or worse." Dkt. 126 at 7. At the meeting, Quinn argues that "Potter and Young badgered her about what actions she had taken on the Lampkin matter" and "repeatedly accused her of being 'coy' for appearing to be very worried about something but not telling them what." *Id*. Potter declared that Quinn "refused to answer basic questions regarding the status of tasks she had been assigned to do in her role as legal counsel." Dkt. 104 at 5. Quinn argues that Potter and Young's badgering increased her fear of retaliation or harm and caused her to state "I can't do this anymore" and leave the meeting without further explanation. Dkt. 126 at 7. Young testified that he perceived Quinn to be extremely distressed. Dkt. 103-8 at 65. Young testified that he stopped by Quinn's office that afternoon to try to hear her side of the story, but her door was locked, and she mouthed the words "I can't" through the window. *Id*.

On November 6, 2015, Schwabe scheduled Christie to interview Quinn on November 12, 2015 at 8:30 a.m. regarding the Lampkin matter. Dkt. 126 at 8; Dkt. 129-1 at 513. Quinn alleges that the subject of the interview was Potter's "conduct toward female employees" and Holmes's "refusal to promptly or effectively address it." Dkt. 1, ¶

18. Potter testified that between November 6th and November 12th, 2015, he discussed with Young and Deputy City Manager Dave Mercier ("Mercier") the possibility of putting Quinn on leave. Dkt. 103-6, at 263–64. Potter testified that he talked to Mercier instead of Schwabe about the possibility of putting Quinn on leave because he knew Schwabe and Quinn were friends and because he believed Schwabe had been untruthful with him about the Lampkin matter. Dkt. 103-6 at 283. Specifically, Potter testified that he believed Schwabe had told him that a decision to extend Lampkin's paid status two weeks past a previously proposed date was a decision that she and Holmes made jointly when it was actually Schwabe's decision that Holmes approved. Dkt. 103-6 at 283–84. Young testified that he and Potter decided not to follow City policy and to speak to Mercier instead of Schwabe because of Potter's concerns about Schwabe's honesty and because of an email Schwabe had sent Young on November 6th, 2015 "where she was asking to work with [Quinn] on a matter that was outside of [Quinn's] usual practice suggested that part of the stress [Quinn] might be laboring under may have related to Suzi Schwabe . . . ." Dkt. 103-8 at 204–05. Holmes testified that he was out of the country when Quinn was placed on leave and was not notified in advance of Potter and Young's decision. Dkt. 101-1, at 231.

On November 12, 2015, five minutes before Quinn was scheduled to speak with Christie, Young instructed Quinn to meet instead with him and Potter about a disciplinary matter. Dkt. 1, ¶ 18; Dkt. 126 at 8; Dkt. 129-1 at 408. Quinn requested that Lofton be permitted to attend the meeting as her witness. Dkt. 1, ¶ 19; Dkt. 129-1 at 408. Potter and Young told her the meeting would address issues protected by attorney client privilege

and suggested Lloyd, a white male colleague of Quinn's, be Quinn's witness. Dkt. 1, ¶ 19. Quinn then requested that Schwabe, the female HR director, be her witness because department heads could hear privileged communications. *Id*. Potter and Young denied her request and instead asked Facilities Director/Risk Manager Tim Haldeman ("Haldeman"), a white man, to be Quinn's witness. *Id*; Dkt. 129-1 at 409. Quinn testified that Haldeman attended the meeting even though she did not agree to his presence. Dkt. 129-1 at 409.

The meeting took place in a small "glass encased" conference room where participants were visible to Quinn's colleagues and the general public. *Id*. Young informed Quinn she was the subject of an investigation, but Quinn alleges that he "refused to tell her the nature or subject of the investigation." Dkt. 1, ¶ 20. Quinn testified that Potter and Young asked her why she had suddenly left the November 5, 2015 meeting, and she answered their questions. Dkt. 129-1 at 397. Quinn testified that she told Potter and Young she "felt she was being retaliated against for objecting to Potter's conduct and being willing to report it to an investigator." Dkt. 126 at 8; Dkt. 129-1 at 409.[5] Potter also accused Quinn of failing to provide him with a specific piece of information related to an assignment she had completed in October 2015. Dkt. 126 at 9. Young said Quinn had admitted to Young that she had failed to provide the information, though Quinn denies having done so. *Id*. Potter testified that Quinn began yelling at him about his December 2013 comment and his reference to a female employee as a "bitch"

---

[5] Quinn explains that the City claims attorney client privilege over the specific comments Quinn knew Potter had made and planned to share with Christie. Dkt. 126 at 8.

and did not provide an explanation in response to his questions about the October legal advice issue and her behavior in the November 5th meeting. Dkt. 103-6 at 289–91.

At the meeting, Potter and Young informed Quinn that she was being placed on administrative leave.  Dkt. 1, ⁋ 18; Dkt. 92, ¶ 5. Young produced a pre-signed letter relating to the leave and did not inform Quinn "why or for how long she was being placed on paid administrative leave." Dkt. 1, ⁋ 20; Dkt. 129-1 at 409. Later that day, Potter and Young emailed Quinn's colleagues and clients advising them she had been placed on paid administrative leave. Dkt. 1, ⁋ 20. Quinn argues that "[n]ormally administrative leave was used only for very serious matters such as police shootings and other terminable offenses, and the reasons for the leave were always discussed with the employee and documented by the supervisor at the outset of the leave." Dkt. 126 at 9; Dkt. 129-1 at 409. Quinn argues that her administrative leave was outside City policy or practice in a number of ways including failure to seek approval from the City Manager or HR director, the public notification of her administrative leave, and the extent of time she remained on leave. Dkt. 126 at 10.  Quinn testified that she was on leave longer than any other case she was aware of other than in the police department. Dkt. 129-1 at 520.

Potter testified that over the first week Quinn was on leave, he "attempt[ed] to determine a cause of her very unusual behavior on November 5th and November 12th" through speaking with Young and Holmes and through reviewing Quinn's emails. Dkt. 103-6 at 270. Potter testified that because he knew Quinn believed the City did not do enough to overcome gender discrimination and because he knew she did not support his appointment as City Attorney, he speculated that Quinn's behavior could be explained by

a scenario where Quinn was colluding with Lampkin's counsel on Lampkin's case of discrimination against Potter and the City. *Id.* at 279–80. Potter testified that he discussed his speculation with Young, Young confirmed that he also did not trust Quinn, and they discussed what they could do about it, such as searching Quinn's emails. *Id.* at 280.

Potter declared that on November 17, 2015, he and Young met with Holmes, Mercier, and Schwabe to discuss Quinn's leave, and "the group confirmed that the decision to place her on leave was appropriate under the circumstances and determined she should remain on paid leave." Dkt. 104 at 6.

On November 18, 2015, Quinn filed a workplace complaint with the City and retained counsel shortly thereafter. Dkt. 92, ¶ 6. The complaint alleged Potter and Young had subjected Quinn to discrimination, retaliation, and hostile work environment. Dkt. 1, ¶ 20; Dkt. 129-6 at 17. The complaint described how (1) Quinn had raised concerns about Potter's December 2013 comment with both Potter and Young and Potter had immediately given Quinn the cold shoulder, (2) Quinn was the only female applicant and one of two finalists for the Chief Assistant City Attorney position but was not hired, (3) Potter had referred to another female attorney as a bitch and referred jokingly to another female staff member's wig, (4) Quinn was told in the November 12, 2018 meeting that she was subject of an investigation but not informed of the nature or subject of the investigation and was immediately placed on administrative leave, (5) Quinn's fear and uncertainty about the future of her career, and (6) the work environment created by Young and Potter caused her to "lose sleep, lose weight, throw up and suffer anxiety and panic for which [she has] sought medical treatment," "have nightmares about the

discriminatory work environment," and feel "physically afraid of Mr. Potter." Dkt. 129-6 at 18–19. On November 23, 2015, the City hired Katherine Weber ("Weber") to investigate the claims in Quinn's complaint. Dkt. 101-2 at 13.[6]

Following four requests from Quinn that the City explain why she had been placed on leave, Quinn received a letter from Potter and Young dated December 14, 2015. Dkt. 129-1 Exhibits at 166–67.[7] The letter explained that she had been placed on leave so that the City could investigate the incident in October 2015 when Potter believed Quinn had failed to "own" a mistake, as well as Quinn's alleged unprofessionalism in failing to answer questions posed to her in the November 5th meeting and in leaving the meeting without explanation. *Id*. The letter concluded: "[s]ince November 12, the City has determined that it is appropriate that pending conclusion of an investigation to be conducted by an outside investigator, you should remain on paid administrative leave." *Id*. at 167. Potter declared that after Young sent this letter, he understood that the City Manager's Office retained an outside attorney for legal advice, Colleen Kinerk ("Kinerk") and retained Weber to investigate Quinn's complaint. Dkt. 104, ¶¶ 21–22. Potter and Young declare that as the subjects of Quinn's complaint, they had no role in the investigation or consultation with outside counsel. *Id*, ¶ 22; Dkt. 105, ¶ 16.

---

[6] While Weber's report states that she was hired on November 23, 2016, not November 23, 2015, this is almost certainly a scrivener's error given that the report detailing the completed investigation is dated May 4, 2016. Dkt. 101-2 at 13.

[7] Exhibits to the excerpts from Quinn's deposition testimony included in Dkt. 129-1 begin at ECF page 165. The Court refers to this portion of Dkt. 129-1 as "Dkt. 129-1 Exhibits."

Quinn testified that Holmes received an email from Kinerk "advising him on December 29th, 2015 to bring Debra back to work, and he did not do so. Instead he engaged in a meeting with Mr. Potter and Mr. Young, and I don't know what happened after that." Dkt. 129-1 at 465. In December 2015 and January 2016, Weber interviewed Quinn and other witnesses. Dkt. 1, ¶ 20. Quinn alleges that Weber tabled her investigation in January 2016 "without explanation and without having interviewed" Potter or Young. *Id*. Potter declared that he attended an investigatory interview with Weber in December 2015, where, based on the questions Weber asked him, he believed Quinn may have disclosed the City's "privileged communications and confidences" to Weber. Dkt. 104, ¶ 23. Potter declared that he did not have authorization from the City to speak about privileged information so the interview was suspended. *Id*. Young also declared that his interview with Weber in December 2015 was suspended based on concerns about privilege. Dkt. 105, ¶ 17. Potter and Young also both declared that they were interviewed in January 2016 by another outside attorney, Marcella Fleming Reed, regarding their decision to place Quinn on administrative leave. Dkt. 104, ¶ 24; Dkt. 105, ¶ 18. Potter also declared that he "did not have a role in deciding if or when Ms. Quinn would return to work." Dkt. 104, ¶ 25.

Quinn testified that through a public records request, she became aware of emails between Holmes and Mercier stating that the Quinn investigation should not be completed until after the City Council approved the Lampkin settlement. Dkt. 129-1 at 465. She testified that "the only two individuals who were interviewed following the Lampkin settlement were Mr. Potter and Mr. Young." *Id.* at 465.

Quinn testified that based on information she received through a public records request, she believes she was kept on leave while the Lampkin matter and another discrimination matter, the Armstrong matter were settled to prevent her from providing "damaging information" about Holmes, Potter, and Young's conduct "and the pervasive hostile work environment towards older female employees." Dkt. 129-1 at 209–10; Dkt. 1, ¶ 21. Quinn testified that she came to believe that "by putting off interviewing Mr. Potter and Mr. Young until after the Lampkin settlement, there would only be hearsay information about the comments made by Mr. Potter. And once they were interviewed it was actual evidence that the city had, which I believe should have been disclosed to both Ms. Armstrong's attorney and Ms. Lampkin's attorney." Dkt. 129-1 at 466.

**D.    2016**

At some point, Holmes hired Linda Walton ("Walton") to work as a facilitator with Potter, Young, and Quinn around Quinn's return to work. Dkt. 103-2 at 285–86. Holmes testified that he targeted February 8, 2016 as the day Quinn would be able to return to work from administrative leave "with time and effort spent on facilitation in the meantime." Dkt. 101-1 at 241. Quinn testified that Holmes did advise her of the February 8th, 2016 intended return date, but she asked to extend the leave "because the facilitator who had been assigned to contact me did not contact me for a while." Dkt. 103-2, at 329.

Quinn alleges that while she was on leave, she heard "many rumors circulating in the community regarding the reasons for her leave, including that she had done something wrong" and "miss[ed] many important meetings and events which adversely affected her ability to effectively and efficiently do her work upon her return." Dkt. 1, ¶

22. On March 1, 2016, Quinn returned from administrative leave. Dkt. 92, ¶ 5. Potter declared that when Quinn returned to work, he "welcomed her back and encouraged the office to do the same." Dkt. 104, �ℙ 27. Upon her return to work, Quinn met with Holmes and informed him that she had retained an attorney. Dkt. 1, ¶ 8. Holmes testified that upon Quinn's return, she was subject to no workplace discipline, corrective counseling, or verbal reprimand on the basis of the reasons the City had cited for placing her on administrative leave. Dkt. 103-11, at 237–38. Quinn alleges that when she returned to work, she found Potter and Young had reassigned some of her responsibilities. Dkt. 1, ℙ 21. Quinn testified that the City delayed her merit pay increase while she was on leave. Dkt. 129-1 at 262.

On April 14, 2016, Weber resumed her investigation and interviewed Young and Potter. Dkt. 1, ℙ 22. Weber issued her report on May 4, 2016. Dkt. 101-2 at 13. The report sustained Quinn's allegations that Potter had made four offensive gender-based comments. Dkt. 1, ℙ 22; Dkt. 100 at 5; Dkt. 101-2 at 13. Quinn alleges that Holmes should have placed the investigation's findings in Potter and Young's personnel files but did not and should have provided the investigation's findings to the City HR office but did not. Dkt. 1, ℙ 22. Holmes argues that he met with Quinn and Weber on May 23, 2016 to discuss Weber's findings. Dkt. 100 at 6. Holmes argues that at this meeting he explained to Quinn that "due to extenuating circumstances, the investigatory process had been necessarily prolonged." *Id.*

In April or May 2016 Quinn filed a complaint with the EEOC. Dkt. 127 at 13. In August 2016 Quinn filed a complaint with the Washington State Human Rights

Commission. Dkt. 127 at 13. On September 21, 2016, Holmes wrote a memo documenting verbal counseling he argues he gave Potter at some time following Weber's report. Dkt. 100 at 5; Dkt. 1, ⁋ 22. In November 2016, Homes, Potter, and Young modified Quinn's duties by removing her from representing the City in labor and employment matters. Dkt. 1, ⁋ 22; Dkt. 92, ¶ 9. Holmes argues that this decision was made following a conversation he had with an ethics expert regarding his concern that Quinn's EEOC complaint conflicted with her employment work on behalf of the City. Dkt. 100 at 6. In September 2017, Quinn filed an internal whistleblowing complaint with the City "after learning that several other female employees of the City ha[d] also filed gender discrimination and hostile working environment claims in the preceding year." Dkt. 1, ⁋ 23; Dkt. 92, ⁋ 9. Quinn alleges that though she pointed out that these multiple claims were costly to the City and that the City intentionally covered up evidence of discrimination in some cases to avoid impacting others, the City failed to contact her in any manner regarding these claims. Dkt. 1, ⁋ 23. The complaint references emails between Holmes, Weber, Young, Potter, and others regarding resuming Weber's investigation of Quinn's complaint following the settlement of the Lampkin matter. Dkt. 129-1 Exhibits at 176. Quinn reviewed these emails after placing a public records request. *Id.*; *see also* Dkt. 129-1 at 209–10 (Quinn testified: "I believe . . . that my investigation was delayed on purpose for the reasons of withholding evidence, and that came out in my public records request.")

In November 2017, Quinn filed the instant complaint. Dkt. 1.[8] Potter declared that "[a]t times since she filed her claims against the City, Ms. Quinn's job duties and access to confidential employment matters have been restricted at request of our client, the City of Vancouver and pursuant to my ethical obligations as a supervisory attorney" based on concerns about conflict of interest. Dkt. 104, ¶ 33. On June 26, 2019, the City terminated Quinn's employment. Dkt. 118.

## III. DISCUSSION

The Court will address each motion for summary judgment in the order filed.

### A. Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").

---

[8] While Quinn discusses facts which occurred after the filing of her complaint in her opposition briefs, Dkts. 126, 127, 128, the Court does not set out, analyze, or make rulings based on those facts as they are not described in the operative complaint and thus not properly before the Court. These facts are the subject of Quinn's pending motion for leave to amend, noted for August 16, 2019. Dkt. 141.

*See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Holmes's Motion for Summary Judgment**

Holmes's motion for summary judgment focuses on lack of causation. Dkt. 100 at 2. Holmes argues Quinn cannot show he was responsible for the decision not to hire Quinn as Chief Assistant City Attorney or for the decision to place her on paid administrative leave. *Id*. at 1.

Quinn alleges claims against Holmes for sex discrimination in violation of RCW 49.60.30 & .180, retaliation in violation of RCW 49.60.180, retaliation for speech on matters of public concern in violation of the First Amendment, outrage, and negligent supervision. Dkt. 1.

## 1.      Holmes's Motion to Strike

Holmes argues that "[t]hroughout her brief and deposition testimony, Quinn makes countless assertions that are not based on personal knowledge or constitute inadmissible hearsay" and requests that the Court strike all such evidence. Dkt. 135 at 9. At summary judgment, a court may consider evidence that "could be presented in an admissible form at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). Pursuant to Fed. R. Civ. P. 56(c)(2) "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Court will consider Holmes's motion to strike under these standards as applicable to Quinn's specific contentions addressed throughout this section of the Order.

## 2.      Disparate Treatment Claims

### a.      Sex-based Disparate Treatment

To establish a prima facie disparate treatment claim, Quinn "must show that [her] employer simply treats some people less favorably than others because of their protected status." *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 743 (2013) (citing *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 226 (1996)). She may either satisfy "the *McDonnell Douglas* burden-shifting test that gives rise to an inference of discrimination" or show direct evidence that Holmes "acted with a discriminatory motive

in taking an adverse employment action against [her] based on [her] protected status," *id.* at 743–44 (citing *Kastanis v. Educ. Employees' Credit Union*, 122 Wn.2d 483, 491 (1993)), and show that she was doing satisfactory work, *Marin v. King Cty.*, 194 Wn. App. 795, 808–09 (2016). *See also Scrivner v. Clark College*, 181 Wn.2d 439, 445 (2014) (en banc) ("Where a plaintiff lacks direct evidence, Washington courts use the burden-shifting analysis in *McDonnell Douglas* . . . to determine the proper order and nature of proof for summary judgment.") (internal citations omitted).[9] Once the prima facie case is established, the employer must show a legitimate reason for the treatment. *McDonnell Douglas*, 411 U.S. at 802–04. Finally, the plaintiff must show pretext, and in Washington, the plaintiff "may satisfy the pretext prong of the *McDonnell Douglas* framework by offering sufficient evidence to create a genuine issue of material fact either (1) that the employer's articulated reason for its action is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wn.2d at 441–42.

Quinn argues that "Holmes's approval of Potter's promoting Young instead of Ms. Quinn in October 2014 constitutes prima facie discrimination." Dkt. 127 at 16. Applying the *McDonnell Douglas* burden-shifting test to this claim, the prima facie case is established. Quinn, a woman, belongs to a protected class, she applied for a job for which she was qualified, she was not hired for the job, and the person hired, Young, a man, had

---

[9] The *McDonnell Douglas* burden-shifting test comes from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

substantially less experience than Quinn. *See Mikkelsen v. Public Utility District No. 1 of Kittitas Cty.*, 189 Wn. 2d 516, 532 (2017).

Holmes's primary argument appears to challenge this prima facie case and is unpersuasive. Holmes argues that the full extent of his involvement in the hiring decision was that "[a]fter Potter determined that he did not believe that either Lloyd or Quinn were qualified, he consulted with Holmes about his intention to appoint Young to the position." Dkt. 100 at 9. Quinn counters that Potter consulted Holmes before making his final decision, and Holmes "approved of Potter's plan to completely abandon the interview process and to appoint Young," implying that a different outcome would have resulted had Holmes not approved of Potter's plan. Dkt. 127 at 16.

Holmes reasons that a prima facie case against him cannot be established because he was not the decision-maker and so cannot be found to have taken an adverse action against Quinn. Dkt. 100 at 10. However, Holmes testified in his deposition that primary authority to hire and fire employees at the City was vested in him by the City charter, the municipal code, and the administrative policies. Dkt. 101-1 at 99–100. Holmes testified that City policy permitted him to delegate his authority and he had "informally delegated the hiring of kind of second in command, the deputy role in the City Attorney's Office. That would be the chief assistant." *Id*. A trier of fact could find that Holmes effectively made this decision. Even so, Holmes does not cite authority, and the Court is not aware of any, for the proposition that a manager who delegates hiring authority is absolved of all liability if the delegate wields that authority in a discriminatory manner.

Next, Holmes would have to show a legitimate reason for the hiring decision. *McDonnell Douglas*, 411 U.S. at 802–04. In the legal argument section of his motion, Holmes argues that he simply consulted with Potter about Potter's decision. Dkt. 100 at 10. In the facts section of his motion, Holmes explains that in his consultation with Potter, Potter shared "concerns about Quinn's and Lloyd's abilities to serve in the position." Dkt. 100 at 3. Holmes testified that he shared Potter's concern about Quinn and that in his experience she did not "consistently provide thorough and sound legal advice that also supported the client meeting their objectives." Dkt. 100 at 3 (citing Dkt. 101-1 at 154). The Court understands these facts to constitute Holmes's proffered legitimate reason for the hiring decision and finds that his burden of production is met. *Edman v. Kindred Nursing Ctrs. W., LLC*, No. 14-CV-01280 BJR, 2016 WL 6836884 at *8 (W.D. Wash. 2016) ("The employer must produce relevant admissible evidence of another motivation, but the burden is of production, not persuasion.") (internal citation omitted).

The third step of the analysis requires the plaintiff to put forward evidence of pretext by showing the employer's articulated reason for its action is pretextual or discrimination was a substantial factor motivating the employer acting under a stated legitimate reason. *Scrivner*, 181 Wn. 2d at 441–42. In *Scrivner*, the Washington Supreme Court found that a 55-year-old plaintiff who alleged age discrimination in a college's failure to hire her for a tenure track teaching position had put forward sufficient evidence to create a genuine issue of material fact by showing she was one of four candidates referred to the final stage of the hiring process but the college chose to hire two applicants under the age of 40 and the college's president had stated there was a "glaring

need" for younger faculty, hired multiple people under 40, and "requested applicants with 'funk' 'i.e., youthfulness.'" *Id.*

Holmes argues that even if his consultation was part of the hiring process, there is no evidence he harbored discriminatory animus. Dkt. 100 at 9. Quinn argues that she was the only female candidate out of an original pool of eighteen. Dkt. 127 at 4. Quinn testified that Potter wrote a memo which "include[d] information that Mr. Holmes felt I wouldn't do a good job as Chief Assistant or a City Attorney." Dkt. 129-1 at 533. As noted, Holmes testified that he shared Potter's concerns about Quinn and found that in his experience she did not "consistently provide thorough and sound legal advice that also supported the client meeting their objectives." Dkt. 100 at 3 (citing Dkt. 101-1 at 154). Quinn argues that Holmes did not make negative comments about other applicants (who were all men). Dkt. 127 at 16. Quinn argues that Holmes's approval of Potter's "striking departures from established policy and practice" in the hiring process "certainly raises at least a triable fact as to whether the proffered excuse was legitimate." Dkt. 127 at 16. Quinn cites other statements or actions she argues show pretext, including Holmes's reference to diversity as a "shiny ball." Dkt. 127 at 24.

Holmes argues that: (1) Quinn misinterprets his "shiny ball" statement and (2) the statement is inadmissible because Quinn did not hear the statement herself. Dkt. 135 at 5. Regarding the meaning of the statement, the Court finds that Holmes's intent is a question of fact. Regarding Holmes's evidentiary objections, Quinn testified to the names and statements of three individuals who heard the remark. Dkt. 129-1 at 486–87. Holmes fails to show these individuals would not be available to testify at trial and the evidence

would not be admissible as, for example, a statement of an opposing party under Fed. R. Evid. 801(d)(2). *See* Fed. R. Civ. P. 56(c)(2).

Moreover, in *Scrivner*, the Washington Supreme Court declared its agreement with the California Supreme Court's rejection of the "stray remarks doctrine." 181 Wn.2d at 450 n.3 (citing *Reid v. Google, Inc.*, 50 Cal. 4th 512, 538–46 (2010)). The doctrine provides that "statements that non-decision-makers make or that decision makers make outside of the decisional process are deemed 'stray,' and they are irrelevant and insufficient to avoid summary judgment." *Id.* (citing *Reid*, 50 Cal. 4th at 517). The Washington Supreme Court explained that it agreed with the California Supreme Court that these remarks may be relevant, circumstantial evidence of discrimination. *Id.* (citing *Reid*, 50 Cal.4th at 539). Considering Washington's acceptance of this doctrine, a reasonable juror could consider Holmes's "shiny ball" statement and his criticism only of Quinn to be circumstantial evidence that discrimination was a substantial factor motivating Holmes's role in the decision not to hire Quinn for the Chief Assistant City Attorney role.

Though it is a close question, the Court finds that these points create an overall picture sufficiently analogous to *Scrivner* such that a genuine issue of material fact exists as to whether gender was a substantial factor motivating Holmes's decision not to object to Potter's plan to abandon the panel interview process and hire Young as Chief Assistant. *See Scrivner*, 181 Wn.2d at 442. Therefore, the Court denies Holmes's motion for summary judgment as to discrimination based on gender.

### b.      Hostile Work Environment Basis for Disparate Treatment

In her opposition, Quinn argues that she has also established disparate treatment by Holmes on the basis of a hostile work environment. Dkt. 127 at 18. Holmes counters that because Quinn did not allege that he was liable for a hostile work environment in the operative complaint, the Court should not permit Quinn to raise new allegations in her motion. Dkt. 135 at 3. At least one of the divisions of the Washington Court of Appeals has found that a hostile work environment may constitute the adverse employment action for the purpose of stating a claim of disparate treatment. *Alonso*, 178 Wn. App. at 748. Therefore, the Court finds that it may consider whether the hostile work environment Quinn alleges could constitute an alternate basis to deny summary judgment on her disparate treatment claim.

A prima facie hostile work environment claim consists of facts tending to show the plaintiff was subject to harassment and "(1) the harassment was unwelcome, (2) the harassment was because the plaintiff was a member of a protected class, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer." *Id*. at 749 (2013) (citing *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 275 (2012)). The Washington Supreme Court has explained that "[a] hostile work environment 'occurs over a series of days or perhaps years . . . . Such claims are based on the cumulative effect of individual acts." *Loeffelholz*, 175 Wn.2d at 273 (quoting *Antonius v. King County*, 153 Wn.2d 256, 264 (2002)). "The standard for linking discriminatory acts together in the hostile work environment context is not high." *Id.* at 276.

First, Holmes argues that Quinn testified that her hostile work environment claim was premised only on Potter's comments. Dkt. 135 at 3 (citing Dkt. 136, Supplemental Declaration of Sheryl Willert, Ex. A., Deposition of Debra Quinn, at 249). However, the referenced portion of Quinn's deposition is not clear whether it refers to a HR complaint or the operative complaint in this case. Dkt. 136 at 249. Additionally, Quinn's testimony, in addition to citing the comments, lists "the retaliation, by being put on leave, and not being selected as the Chief Assistant" as the premise of her "complaint on the hostile work environment." Dkt. 136 at 249. The Court finds that this testimony does not conclusively limit Quinn's ability to claim Holmes is liable for disparate treatment through the creation of a hostile work environment.

Second, regarding his alleged failure to respond appropriately to Potter's comments, Holmes argues that he first became aware of Potter's comments when Quinn filed her complaint on November 18, 2015 and that when the investigation substantiated the comments, he verbally counseled Potter and memorialized the counseling. Dkt. 135 at 4. Holmes implies that every reasonable juror would conclude his testimony that he first became aware of the comments on November 18, 2015 is uncontested, the appropriateness of his decision to wait until the investigation concluded to take corrective action is uncontested, and his decision about what corrective action was appropriate is also uncontested. The Court finds that even though Quinn's testimony supporting an inference that Holmes knew about the comments prior to November 2015 is vague, it is some evidence contradicting Holmes's version of events and could support an inference he did not take discriminatory comments in the workplace seriously. Dkt. 129-1 at 263.

Moreover, whether the promptness and seriousness or lack thererof of Holmes's actions was reasonable even if he did first become aware of the comments on November 18, 2015 is a question of fact.

Third, Holmes argues that Quinn's claims that Holmes deprioritized gender discrimination issues and created an atmosphere of fear of retaliation among female employees at the City are "unsupportable." Dkt. 125 at 4. Holmes cites his deposition testimony that diversity trainings were only temporarily suspended due to the City's focus on preserving jobs. Dkt. 135 (citing Dkt. 136 at 63–64). This testimony must be compared to Quinn's testimony that at the same time Holmes became City Manager, the City "stopped consistent harassment diversity training, we stopped our diversity committee, committees that we had, we stopped employee get-together functions that, similar functions that we had previously" and as City Manager Holmes controlled whether these events occurred. Dkt. 129-1 at 164, 485. These dueling perspectives simply create a question of fact as to what actions Holmes took regarding gender diversity and what impact these actions had. Additionally, as previously set out, the Court disagrees with Holmes that evidence about his "shiny ball" statement is conclusively inadmissible. Though the Court agrees with Holmes that his testimony about actions he took prior to being hired as City Manager are not at issue, the Court finds that Quinn has sufficiently shown questions of fact exists as to whether Holmes could be liable for disparate treatment through subjecting her to a hostile work environment. *See Loeffelholz*, 175 Wn.2d at 273.

Finally, Holmes also argues that though Quinn included discrimination based on national origin and age in her EEOC complaint, she testified in her deposition that she does not intend to pursue her discrimination claims on these bases. Dkt. 100 at 14 (citing Dkt. 101-4, Deposition of Debra Quinn, at 613–14). Holmes requests that the Court grant summary judgment on these claims to clarify the record. *Id.* Quinn does not address Holmes's request in her opposition. *See* Dkt. 127. Under the Local Rules, the Court may consider a failure to respond as an admission that the motion has merit. Local Rules W.D. Wash. LCR 7(b)(2). Therefore, the Court grants Holmes's motion for summary judgment as to Quinn's claims for discrimination only as to discrimination based on national origin and age.

### 3. Retaliation Claims

To establish a prima facie case of unlawful retaliation under the WLAD, Quinn must show she engaged in protected activity, Holmes took an adverse employment action or actions against her, and "retaliation was a substantial factor behind the adverse employment action." *Edman*, 2016 WL 6836884 at *6 (citing *Sims v. Lakeside Sch.*, No. C06-1412RSM, 2008 WL 2811165, at *3 (W.D. Wash. Jul. 16, 2008)). If the plaintiff asserts a prima facie claim, "the 'burden shifting' scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

Quinn argues that Holmes's "approval of and collusion in Potter and Young's keeping Ms. Quinn on administrative leave for nearly four months constitutes prima facie retaliation." Dkt. 127 at 17. Quinn argues that her statements in the November 4, 2015

meeting reporting Potter's offensive comments to Holmes and Schwabe, "prompting them to retain an outside investigator" constitute protected activity. Dkt. 127 at 17. Regarding an adverse employment action, Quinn identifies her publicized extended administrative leave. Dkt. 127 at 17–18. Regarding retaliation as a substantial motivating factor, Quinn argues that Holmes conspired with Potter and Young to keep Quinn on leave "in order to prevent Ms. Quinn from sharing information with the investigators until after two other employment matters had been settled." Dkt. 127 at 18. Among other points, Quinn argues that the timing of the leave, commencing just as she was about to report Potter's comments to Christie in the Lampkin matter, and its extended duration, lasting past the settlement of both the Lampkin matter and another gender discrimination matter, show that retaliation was a substantial factor in her administrative leave. Dkt. 127 at 18.

Holmes argues that Quinn cannot establish causation because she was placed on paid leave six days before filing any complaint. Dkt. 100 at 10–11 (citing *Alonso*, 178 Wn. App. at 753–54). While it is true that Quinn's formal complaint was filed after she was placed on leave, Holmes has failed to persuade the Court that reporting Potter's comments which could be material to Lampkin's discrimination claim in the November 4, 2015 meeting could never constitute protected activity. Holmes's motion is based on causation only—his argument that he did not make the decision to place Quinn on paid leave, and his argument that the decision to place Quinn on paid leave preceded her first complaint. Dkt. 100 at 11. However, Quinn cites the delay in returning her to work as the factual basis for Holmes's liability. Dkt. 127 at 17–18. While Holmes argues that he

"began the process of returning Quinn to work" in early January 2016, Dkt. 100 at 5, his

argument does not eliminate a question of fact as to whether he delayed her return. Given

that Quinn's administrative leave extended well beyond her November 18, 2015

complaint, it is not clear retaliation based on this complaint could not constitute a

motivating factor in any delay which may have occurred. Regarding Quinn's intent to

communicate with Christie, the Lampkin investigator, Holmes argues in reply that

because Christie was retained as outside counsel in the Lampkin matter, not as an

investigator, "the entire premise of Quinn's retaliation is unsupported, and it is clear that

Defendants were not seeking to avoid the disclosure of information." Dkt. 135 at 6.

Quinn testified that she thought Christie might have been hired like Weber, as an outside

investigator who would produce a report subject to public disclosure, but later understood

based on her review of public records requests that Christie was providing legal advice to

the City. Dkt. 136 at 292–93. Homes provides no authority for the proposition that

Quinn's intent to communicate with Christie regarding Potter's conduct could never

constitute protected activity and even if that communication would have been privileged,

Quinn may have reasonably understood that communicating with Christie could help put

an end to Potter's discrimination. The Court finds that disputes of fact exists as to

Quinn's intent to communicate with Christie, Holmes and Potter and Young's

understanding of what she intended to communicate, and the motivation for keeping

Quinn on leave for such a substantial period of time. Dkt. 100 at 10–11; Dkt. 135 at 6.

Holmes also argues that because he did not make the decision to place Quinn on

paid leave, Quinn's retaliation claims against him must fail. Dkt. 100 at 7. Holmes argues

1  he was out of the country, was not consulted, and did not have advance knowledge of the

2  decision. Dkt. 100 at 11. Quinn does not argue that Holmes retaliated against her by

3  deciding to place her on leave, arguing instead that the delay in returning her to work

4  constituted an adverse employment action. Dkt. 127 at 17–18. Regarding the delay in

5  returning Quinn to work, Holmes argues that following his return, he "engaged Linda

6  Walton to work with Quinn, and Young and Potter, and facilitate Quinn's return" and the

7  investigation was prolonged "due to extenuating circumstances, which were explained to

8  Ms. Quinn." Dkt. 100 at 11. The Court finds that given Holmes's hiring and firing and

9  supervisory authority, Quinn's testimony that extended administrative leave was only

10 used in the most serious cases typically ending in termination, and Holmes's involvement

11 in at minimum Walton's hiring which appears to have impacted the duration of Quinn's

12 leave, it is possible that a reasonable juror could conclude Holmes delayed or otherwise

13 bears at least some responsibility for the extended duration of Quinn's leave. Further, the

14 Court finds that a reasonable juror could find that Holmes's delay was motivated either

15 by Quinn's statements in the November 4th meeting or by Quinn's November 18, 2015

16 complaint. Therefore, the Court denies summary judgment for Holmes as to Quinn's

17 retaliation claim.

18     **4.**       **First Amendment Claim**

19     Holmes argues that he enjoys qualified immunity to Quinn's First Amendment

20 claim and that the claim must be dismissed because he did not personally participate in

21 the conduct at issue. Dkt. 100 at 7, 11. Quinn identifies her constitutionally protected

22

speech as (1) reporting Potter's discriminatory comments to HR and to Holmes and (2) her attempt to report Potter's discriminatory comments to Christie. Dkt. 127 at 21.

Regarding the constitutional violation at issue, to balance the interests of the public employee to comment on matters of public concern and the interests of the state as employer to promote efficient public service, courts evaluating public employee First Amendment claims conduct a sequential five-step test which evaluates:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Brownfield v. City of Yakima*, 612 F.3d 1140, 1147 (9th Cir. 2010) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir 2009)). "The plaintiff bears the burden on the first three questions" and the defendant bears the burden on the last two. *Greisen v. Haken*, 925 F.3d 1097, 1108 (9th Cir. 2019).

### a.      Matter of Public Concern

Determining whether speech was on a matter of public concern is a question of law. *Id*. Courts consider the content, form, and context of the speech, looking to factors including the employee's motivation and the audience chosen to analyze form and context. *Id.* (internal citations omitted). Content is the most important factor. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 748 (9th Cir. 2010) (citing *Desrochers v. City of Sen Bernadino*, 572 F.3d 703, 709 (9th Cir. 2009)). The Ninth Circuit distinguished types of content as follows:

> This Court has broadly described two categories of speech: that which 'can fairly be considered to relate to any matter of political, social, or other concern to the community,' *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quotation omitted); and that which 'deals with individual personnel disputes and grievances' such that 'the information would be of no relevance to the public's evaluation of the performance of governmental agencies,' *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983).

*Brownfield*, 612 F.3d at 1147. It is not determinative that an employee airs their concerns privately, particularly when the concerns are addressed to an individual or entity which may "be able to address and correct the problem." *Anthonie*, 605 F.3d at 749.

Regarding the context and form of Quinn's conversation with Holmes and Schwabe, the conversation was private but Quinn reasonably believed that they would take action to address the issue, as Holmes did by hiring Christie. Regarding the context and form of Quinn's intent to speak to Christie, that conversation would have been private, but it is possible that Quinn believed an outside investigation and report or even advice by outside counsel would correct the problem.

Here, the Court has very minimal information about the content of Quinn's speech. Quinn characterizes her speech as a report to HR and attempted report to Christie as an investigator on "the compliance of City leaders with gender discrimination law and City policy." Dkt. 127 at 20. Quinn explains that she "is not able to fully describe the discriminatory comments by Potter because the City has argued that information is subject to its attorney-client privilege and has not provided Ms. Quinn a waiver to disclose it." Dkt. 127 at 6. However, taking all reasonable inferences in favor of Quinn, it is sufficiently clear that unlawful discrimination on whatever basis by the City's Chief

Attorney could be a matter of public concern. Therefore, the Court proceeds to the next step of the analysis.

### b.    Speech as a Private Citizen

"Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071. "[W]hether the plaintiff spoke as a public employee or a private citizen[] is a mixed question of fact and law." *Anthoine*, 605 F.3d at 749 (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008) (alterations in original)). Courts in the Ninth Circuit consider factors including: "(1) whether 'the employee confined his communications to his chain of command'; (2) whether 'the subject matter of the communication' fell within the plaintiff's regular job duties; and (3) whether the 'employee sp[oke] in direct contravention to his supervisor's order[ ].'" *Greisen*, 925 F.3d at 1111 (quoting *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074–75 (9th Cir. 2013) (en banc) (alterations in original)). "The scope and content of a plaintiff's official duties are questions of fact, but a court must 'independently . . . evaluate the ultimate constitutional significance of the facts as found.'" *Id*. (quoting *Posey*, 546 F.3d at 1129).

Quinn was an attorney assigned to the Lampkin matter, paid to provide advice to her client, the City, on how best to handle the matter. The November 4, 2015 meeting was set to discuss the Lampkin matter, and Quinn, an attorney assigned to the case, raised concerns to the City Manager and HR Director "about discriminatory comments she had heard Potter make and their potential materiality to the Lampkin matter." Dkt. 127 at 6.

While Quinn argues that she did not have a legal duty to report Potter's discriminatory comments to the HR Director, Dkt. 127 at 20, it is apparent that her speech in the particular context in which it occurred was within the scope of the tasks she was paid to perform, within the normal channels, on a topic she was asked to speak about at a scheduled meeting. *Griesen*, 925 F.3d at 1111; *see also Anthoine*, 605 F.3d at 750 (citing *Eng*, 552 F.3d at 1071)). The same is true for her intent to speak to Christie on November 12, 2015. Quinn testified that Holmes told her to hire Christie as outside counsel on the Lampkin matter, and Schwabe scheduled her meeting with Christie. Dkt. 129-1 at 513, 553. Quinn has failed to meet her burden to show that speaking to the relevant outside investigator or outside counsel on an employment discrimination claim against the City to which she was assigned was outside her paid job duties as an employment attorney for the City. Moreover, her expected communication was on a subject squarely within her typical job duties.

While the Court found a question of fact about whether Quinn's intent in speaking to Schwabe and Holmes on November 4, 2015 could make her conduct meet the standard for opposition to discrimination under broad construction of RCW 49.60, that intent simply cannot transform statements Quinn made in a high-level meeting, on the topic of the meeting, into statements made outside the role she was paid to perform. Because Quinn has failed to meet her burden to show she spoke as a private citizen, *Greisen*, 925 F.3d at 1108, the sequential First Amendment analysis ends.

Because Quinn cannot establish that Holmes violated her First Amendment rights as a public employee, it unnecessary for the Court to determine whether Holmes is

entitled to qualified immunity for this violation. Therefore, the Court grants summary

judgment for Holmes on Quinn's First Amendment claim.

### 5.    Outrage Claim

"Outrage requires proof of three elements: (1) extreme and outrageous conduct,

(2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff

of severe emotional distress." *Robinson v. Pierce Cty.*, 539 F. Supp. 2d 1316, 1332

(citing *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003)). "The alleged conduct must be 'so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community.'" *Id.* at 1332–33 (2008) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59

(1975)). "Whether the conduct is sufficiently outrageous is ordinarily a question for the

jury, but courts must initially determine if reasonable minds could differ as to whether the

conduct was sufficiently extreme to result in liability." *Id.* at 1333 (citing *Phillips v.

Hardwick*, 29 Wn. App. 382, 387 (1981)).

Holmes cites *Haubry v. Snow*, 106 Wn. App. 666, 679 (2001) for the proposition

that a plaintiff asserting separate claims for negligent infliction of emotional distress and

disparate treatment must articulate separate facts supporting each claim. Dkt. 100 at 12–

13. The Court finds that "[u]ntil such a time as Plaintiff is granted judgment on the

WLAD claims, Defendants' concerns regarding a double recovery are premature."

*Naravetla v. Virginia Mason Medical Ctr.*, Case No. C13-1501-JCC, 2014 WL

12778979, at *5 (W.D. Wash. Feb. 18, 2014) (citing *Maxwell v. Virtual Educ. Software,

Inc.*, Case No. C09-0173-RMP, 2010 WL 3120025, at *11 (E.D. Wash. Aug. 6, 2010)).

Holmes argues in the alternative that Quinn cannot establish the elements of an outrage claim against him because he "did not participate in the decisions that are the bedrock of Quinn's claims" and because he did not make any offensive statements. Dkt. 100 at 13. Quinn argues that Holmes's involvement in outrageous conduct includes "overlooking discriminating and harassing comments, to approving and participating in Potter and Young's scheme to lie about Ms. Quinn's work performance as an excuse for her leave, to conspiring with Potter and Young to hide evidence from investigators." Dkt. 127 at 22.

The Court finds that neither Potter's comments nor Holmes's response to them are so extreme in degree as to be regarded as atrocious and that reasonable minds could not differ on this question. *Robinson*, 539 F. Supp. 2d at 1332–33.

Regarding Holmes's involvement in keeping Quinn on administrative leave, as discussed in the Court's analysis of Quinn's retaliation claim against Holmes, there is a dispute of fact whether Holmes is responsible for the extended duration of Quinn's leave, at least between November 18, 2015 and February 8, 2016.

Construing all relevant facts and reasonable inferences in favor of Quinn, after Holmes returned to find Quinn had been publicly placed on administrative leave under false pretenses, he delayed returning Quinn to work and delayed completion of Weber's investigation into Quinn's HR complaint until the Lampkin matter and another employment discrimination matter had settled to avoid the possibility of discovering information which would then have to be disclosed to Lampkin's counsel. While this conduct if true may be unethical, the Court finds it does not reach the exceedingly high

bar for a claim of outrage. *Id.* Therefore, the Court grants summary judgment for Holmes as to Quinn's outrage claim.

### 6. Negligent Supervision

A negligent supervision claim may be brought against an employer where "(1) an employee acted outside the scope of his or her employment; (2) the employee presented a risk of harm to other employees; (3) the employer knew, or should have known in the exercise of reasonable care that the employee posed a risk to others; and (4) that the employer's failure to supervise was the proximate cause of injuries to other employees." *Briggs v. Nova Services*, 135 Wn. App. 955, 966–67 (2006), *aff'd* 166 Wn. 2d 794 (2009).

Holmes argues that Quinn's claim should fail as a matter of law because he is not Potter's employer. Dkt. 100 at 14. To support this argument, he cites an unpublished case which suggests but does not hold that a negligent supervision claim may be dismissed for failure to establish an employer-employee relationship. Dkt. 100 at 14 (citing *Club Level, Inc. v. Wash. State Liquor Control Bd.*, 185 Wn. App. 1016, *10 n.3 (2014)). Quinn argues that Holmes meets the definition of employer in the WLAD, RCW 49.60.040(11). Dkt. 127 at 22. Holmes is correct that Washington tort law uses a narrower definition of employer for the purposes of a negligent supervision claim, asking whether the employee is on the employer's premises and the employer knows or has reason to know of his or her ability to control the employee. *Niece v. Elmview Group Home*, 131 Wn. 2d 39, 51–52 (1997). As previously noted, Holmes testified that all hiring and firing authority at the

City was ultimately his. Dkt. 101-1 at 99–100. Therefore, the degree of control Holmes

had over Potter is a question of fact.

Holmes argues that Quinn's claims are premised on Holmes's response to Potter's

comments, and because Holmes first learned of Potter's comments on November 18,

2015, the City retained an outside investigator shortly following Quinn's first HR

complaint, Holmes verbally counseled Potter when the investigator found the comments

occurred, and Potter has not been alleged to make further comments, Holmes cannot be

liable for negligent supervision. Dkt. 100 at 14. Quinn counters that Young advised

Holmes prior to November 2015 that Potter had made the "bitch" and "wig" comments,

meaning that Holmes was aware Potter was a risk to others prior to his action to injure

Quinn by "fraudulently" placing her on leave on November 12, 2015. Dkt. 127 at 23;

Dkt. 129-1 at 263. As noted in the Court's recounting of the facts, Young testified that on

October 14, 2015, he told Quinn he had talked to Holmes about these comments, Dkt.

103-8 at 63, putting Holmes on notice approximately a month before Quinn was placed

on leave.

While it is a close question whether knowledge that Potter had made the "bitch"

and "wig" comments could place Holmes on notice of a risk that Potter would

"fraudulently" place Quinn on leave, and whether Holmes's failure to reprimand Potter

for these comments could have proximately caused Potter's action to place Quinn on

leave, the Court finds that on the authorities before it that these questions are also

questions of fact. Moreover, if Potter's action was in fact fraudulent, it appears that his

action would fall outside the scope of employment. Therefore, the Court denies summary judgment on Quinn's negligent supervision claim against Holmes.

## C. Potter and Young's Motion for Summary Judgment

Quinn asserts claims against Potter and Young for sex discrimination in violation of RCW 49.60.30 & .180, retaliation in violation of RCW 49.60.180, retaliation for speech on matters of public concern in violation of the First Amendment, and outrage. Dkt. 1. Quinn's claims against Potter and Young are governed by the same legal standards applied to her claims against Holmes; the Court will thus set out additional information about the applicable legal standards only as necessary.

### 1. Potter and Young's Evidentiary Objections

Potter and Young cite a substantial number of statements Quinn made in deposition which they believe are inadmissible hearsay or not based on personal knowledge. Dkt. 134 at 2 n.1. As previously noted, at summary judgment a court may consider evidence that "could be presented in an admissible form at trial." *Fraser*, 342 F.3d at 1037. Pursuant to Fed. R. Civ. P. 56(c)(2) "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Also as previously noted, the Court will consider these evidentiary standards when determining what evidence may be relied upon to grant or deny summary judgment.

### 2. Disparate Treatment Claim

Quinn argues that Potter's decision to promote Quinn instead of Young in October 2014 constitutes prima facie discrimination. Dkt. 128 at 16. The Court agrees that the

prima facie elements are established—as a member of a protected class, Quinn applied for a job for which she was qualified, she was not hired, and the person hired, Young, was outside the class and had substantially less relevant experience. *Mikkelsen*, 189 Wn. 2d at 532.

Although Potter and Young argue that Quinn has failed to establish a prima facie case of discrimination because she "was most similarly[ ]situated with Lloyd, who was also not selected for the position," Dkt. 134 at 7, Potter and Young have failed to cite any authority for the proposition that being similarly situated is an element of a prima facie case. Therefore, the Court rejects this argument.

Potter's argument that he was faced with a dilemma when the interview panels gave a split recommendation and believed Young would be best for the position, Dkt. 128 at 16 (citing Dkt. 103-5 at 161–62), satisfies his burden to produce a legitimate reason for his decision. *Edman*, 2016 WL 6836884, at *8.

Regarding evidence that Potter's decision was pretextual, the Court finds it is possible that a reasonable juror could conclude Potter's decision to promote Young over Quinn was pretextual or substantially motivated by gender discrimination based on Potter's December 2013 comment which could support an inference that Potter did not respect women in the workplace, Potter's comment that the MLT panel should oppose the first panel's preference for Quinn, and the irregularity of the hiring process. *See Scrivner*, 181 Wn.2d at 450 n.3 (comments made by non-decision makers or made outside the decisional process may be relevant, circumstantial evidence of discrimination). While Potter and Young argue that Quinn's testimony regarding Potter's statement at the MLT

panel contradicts another part of her testimony, Quinn's allegedly contradictory testimony that "I don't believe [Chief Molina] said that Potter actually discouraged them as much as he told me . . . Potter made that comment," Dkt. 103-3 at 389, could reasonably be construed as a clarification. Potter and Young also argue that any statement Potter made at the MLT meeting is inadmissible hearsay. The Court finds that evidence of the statement could be presented in an admissible form, such as through the testimony of Chief Molina and/or the exception to the hearsay rule for admissions against interest, Fed. R. Evid. 801(d)(2). Finally, while Potter argues that the City's policy permits him to appoint employees to management roles rather than pursue a recruitment process, the Court finds that it is a question of fact whether the process actually followed in Young's appointment suggests an improper motive. Therefore, the Court denies summary judgment on Quinn's disparate treatment claim as to Potter.

Quinn also appears to argue that Young could be liable for a discrimination claim on the basis of Potter's 2014 hiring decision. Dkt. 128 at 17 ("Young himself, as one of the panel interviewers and as the preferentially-treated male employee in the hiring decision, knew of and actively aided and abetted Potter's discriminatory behavior."). RCW 49.60.180 guards against the unfair practices of employers. *See Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349 ("Both supervisors and employers are potentially liable for violations under chapter 49.60 RCW."). Quinn fails to put forward evidence for the proposition that Young could have been considered an employer or supervisor prior to the operative promotion. Therefore, the Court grants summary judgment on Quinn's disparate treatment claim as to Young.

### 3.    Retaliation Claim

Quinn argues that Potter and Young's decision to put her on administrative leave constitutes prima facie retaliation. Dkt. 128 at 17. Regarding protected activity, Quinn cites her statements in the November 4, 2015 meeting to Holmes and Schwabe "reporting Potter's offensive discriminatory comments" as potentially relevant to the Lampkin matter which prompted Holmes to retain Christie as well as her attempt on November 12, 2015 to speak to Christie "before Potter and Young physically prevented it." Dkt. 128 at 17.[10] Regarding an adverse employment action, Quinn cites her administrative leave. *Id.* Regarding a causal link between her activity and the adverse action, Quinn cites factors including the timing of the leave, beginning on the day she was supposed to speak to Christie, Potter and Young's failure to consult the HR director per City policy, the unusual decision to notify her colleagues and clients that she was on administrative leave, and the long duration of her leave. *Id.* at 18.

Regarding opposition activity, Potter and Young argue that none of Quinn's actions constitute protected activity, citing *Coville v. Cobarc Serv's, Inc.*, 73 Wn. App. 433, 439 (1994). In *Coville*, the Washington Court of Appeals explained that "[t]o determine whether an employee was engaged in protected opposition activity, the court must balance the setting in which the activity arose and the interests and motives of the employer and employee." *Id.* Relevant here, Potter and Young argue that because Quinn was providing legal advice in the November 4, 2015 meeting, it does not constitute

---

[10] While Potter and Young address other potential bases for Quinn's claim, the Court confines its analysis to the bases Quinn advances. *See* Dkt. 128 at 17.

"opposition activity" protected by RCW 49.60. Dkt. 134 at 11. The Court rejects this argument because Potter and Young have failed to show that all legal advice is unprotected activity. Quinn's identification of Potter's comments as discriminatory and necessitating an outside counsel or investigator in the November 4, 2015 meeting could be construed on one hand simply as professional advice to promote the City's best interests in defeating the claim. On the other hand, it is possible that Quinn's intent was to cause the appointment of an outside investigator who would expose Potter's course of discriminatory action against individuals based on gender or based on other protected statuses. Therefore, this question is for the jury. *See Wallace v. Grant Cty. Fire District No. 5*, No. 2:15-CV-108-SMJ, 2016 WL 5886880, at *5 (E.D. Wash. Oct. 7, 2016).

Regarding Quinn's intent to speak to Christie as a witness in the Lampkin matter on November 12, 2015, Potter and Young are correct that another Washington U.S. District Court has held that participation in an employer's internal investigation is not protected "participation" activity under the WLAD. *Reiber v. City of Pullman*, No. 11-CV-0129-TOR, 2013 WL 3984442, *9–10 (E.D. Wash. Aug. 1, 2013). Potter and Young also argue that because Christie was hired as outside counsel, not an investigator, any statements Quinn would have made to him would have been privileged. Dkt. 134 at 12. While Potter and Young cite an invoice Christie provided to the City which supports their characterization of him as outside counsel, Potter and Young would need to show application of the privilege to the particular conversation between Christie and Quinn; moreover, it appears that Quinn intended to report discriminatory conduct to Christie as a witness to that activity. Dkt. 129-1 at 514. The Court finds that while Quinn's intent to

report discriminatory conduct may not meet the definition of participatory activity on its own, it is a question of fact whether it could be part of the same course of opposition conduct begun in the November 4, 2015 meeting.

Regarding an adverse employment action, Potter and Young argue that putting an individual on paid administrative leave and notifying their colleagues and clients is not actionable retaliation. Dkt. 102 at 21. The Court disagrees. "At the summary judgment stage, the Court need only determine whether [the plaintiff] has presented substantial evidence for the jury to find that [the defendant's] action would have dissuaded a reasonable worker from making or supporting a charge of unlawful conduct by [the defendant]." *Edman,* 2016 WL 6836884 at *7 (citing *Boyd v. State, Dep't of Soc. & Health Servs.,* 187 Wn. App. 1, 13–15 (2015); *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006)). Quinn's testimony that administrative leave, particularly publicly announced administrative leave, was typically reserved for cases of serious wrongdoing, constitutes substantial evidence from which a jury could conclude a reasonable worker would be dissuaded from taking action similar to Quinn's.

Regarding causation, Potter and Young also argue that because Quinn fails to allege Potter or Young knew the content of conversations she had with Holmes or Schwabe prior to their decision to place her on leave, she cannot establish that they retaliated against her because of this activity. Dkt. 134 at 11 (citing *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006)). The Ninth Circuit has found that in some cases "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island*

*Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002); *see also Xieng v. Peoples Nat. Bank of Wash.*, 120 Wn.2d 512, 519 (1993) (decisions interpreting Title VII of the Civil Rights Act of 1964 are persuasive authority for the construction of RCW 49.60) (internal citations omitted). In *Cornwell*, the Circuit found that the plaintiff did not present evidence raising an inference that his demotion was caused by his complaints about discriminatory activity because the plaintiff failed to present evidence that his supervisor knew of his protected activity before the demotion and thus no causal inference existed. *Id.* at 1035. However, in the November 12, 2015 meeting, Potter and Young sought an explanation for Quinn's behavior in the November 5, 2015 meeting. Potter testified that in response to his questions, Quinn began yelling at him about his December 2013 comment and his reference to a female employee as a "bitch." Dkt. 103-6 at 289–91. While Quinn's statements could be characterized as a refusal to assuage Potter and Young's concerns regarding the November 5, 2015 meeting, her statements could also be characterized as presenting her opposition to Potter's discrimination directly to Potter and Young, to which they responded by informing her she would be placed on administrative leave and producing a pre-signed letter to that effect. *See* Dkt. 1, ¶¶ 18, 20; Dkt. 92, ¶ 5; Dkt. 129-1 at 409. Potter testified that it was a possibility Quinn would be put on leave prior to November 12, 2015, but the decision was not actually made until the close of the November 12, 2015 meeting, after Quinn complained about his discriminatory comments. Dkt. 103-6 at 262–63; 288–91. Therefore, the Court finds that the prima facie case is established.

Regarding Potter and Young's burden to produce a legitimate reason for putting Quinn on leave and notifying her colleagues and clients, their belief as supervisory attorneys that Quinn was subverting or ceasing to pursue the interests of the City meets the burden of production. *Edman*, 2016 WL 6836884, at *8

Regarding pretext, the Court finds the fact that Quinn was brought back with no cited discipline or corrective action related to the reasons she was allegedly placed on leave, particularly when she was placed on leave in a manner only otherwise used in cases of serious wrongdoing, is sufficient circumstantial evidence from which a jury could conclude that the decision to put her on leave was a pretext for retaliation. Dkt. 103-11, at 237–38. While Potter and Young argue they had no more to do with Quinn's leave after her November 18, 2015 complaint against them, a juror could reasonably infer that if their reasons for placing Quinn on leave in such a dramatic manner were free from retaliatory motivation, she would have received at least some minimal corrective action upon return. The Court finds that the circumstantial evidence is sufficiently specific and substantial that the when construing all reasonable inferences in favor of the plaintiff, a dispute of fact remains. *See Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) (circumstantial evidence of pretext must be specific and substantial) (internal citations omitted). Therefore, the Court denies summary judgment for Potter and Young as to Quinn's retaliation claim against them.

### 4. First Amendment Claim

Potter and Young argue that Quinn cannot show her First Amendment rights as a public employee were violated and cannot defeat their qualified immunity to any such

claim. Dkt. 102 at 12. The Court incorporates and relies on its analysis of Quinn's First

Amendment claim against Holmes. This analysis is the same in all material respects.[11]

The Court concludes here for the same reasons that Quinn cannot establish that Potter and

Young violated her First Amendment rights as a public employee, making it unnecessary

for the Court to determine whether Potter and Young are entitled to qualified immunity

for this violation. Therefore, the Court grants summary judgment for Potter and Young

on Quinn's First Amendment claim.

### 5. Hostile Work Environment Claim

Quinn's claim of hostile work environment through harassment based on gender is

predicated on: (1) three comments Potter made in the workplace between 2013 and 2015,

(2) Young's response or lack thereof to these comments, (3) Young's allegedly false

statement to Potter that Quinn admitted to making a mistake in fall 2015, and (4) the

manner of Potter and Young's conduct in placing Quinn on administrative leave—

"physically forcing" Quinn to meet with them, holding the meeting in a prominent

location in the office, announcing the leave publicly, and leaving Quinn on leave without

indication of the leave's duration or purpose. Dkt. 128 at 19.

Regarding Potter's comments, Potter and Young argue that the December 2013

comment was made outside Quinn's presence and was not about her, the "bitch

---

[11] While it is possible that Potter and Young's scheduling a meeting with her at the same time as her November 12th, 2015 meeting with Christie could be characterized as ordering her not to speak on the topic, Quinn does not advance this argument or cite authority for the proposition that public employee speaks as a private citizen when she speaks within her chain of command on a topic within her job duties with the approval of at least one supervisor but in contravention of another supervisor.

comment" was made in a "jokingly sarcastic" manner, and the "wig comment" was made in an attorney-client meeting discussing a settlement. Dkt. 102 at 23. Potter and Young argue that "there is no evidence to suggest simply learning of or hearing these three comments was so offensive, severe or pervasive that the conduct by Mr. Potter 'altered' conditions of Quinn's working environment . . . ." Dkt. 102 at 24.

Regarding Potter's potential liability, the Court disagrees. While it is true that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and condition of employment'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), it is also true that the Washington Supreme Court instructs courts construing hostile work environment claims to evaluate the "cumulative effect of individual acts" under a standard for linking discriminatory acts together which is "not high," *Loeffelholz*, 175 Wn. 2d at 276. Moreover, while Potter and Young emphasize that none of the three comments were directed to or made about Quinn, this fact is not dispositive as Potter and Young do not cite authority, and the Court is not aware of any, establishing that as matter of law conduct must be directed at the plaintiff in a hostile work environment claim. *See Loeffelholz*, 175 Wn. 2d at 276. ("Here, although [the defendant] made the 'angry man' comment to a group, he *conceivably* intended it to have special meaning for [the plaintiff].") (emphasis added)).

Quinn testified regarding the December 2013 comment that she was not the one who advised HR that the comment had been made "because there was a great atmosphere of fear." Dkt. 129-1 at 268. Regarding the bitch comment, Potter emphasizes that Quinn

testified that no one else in the meeting reacted to the comment, Dkt. 134 at 10 (citing Dkt. 103-3 at 199–200), and cites Weber's workplace investigation report which concluded that other meeting participants felt the comment was inappropriate but not made with bad intent, Dkt. 102 at 23 (citing Dkt. 107-3 at 19). Another reasonable interpretation of Quinn's testimony is that she found it upsetting and surprising that no one else in the meeting reacted to the comment, as demonstrated by her testimony that when she spoke to Young about the comment following the meeting, Young said "he didn't even realize [Potter] had said that, that it was just kind of commonplace for people to call women bitches at the City." Dkt. 129-1 at 200. Quinn also testified that she told Young she did not intend to file a complaint about this comment because she was "1000 percent" afraid of retaliation. Dkt. 129-1 at 408.

The Court finds that from the standpoint of a reasonable person in the workplace, referring to a colleague's anatomy using a vulgar phrase, referring to a colleague using a derogatory term for women, and ridiculing the cancer-caused hair loss of a female colleague who had been fired are all objectively offensive. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1115 (9th Cir. 2004). Quinn's testimony shows that she found all of these comments subjectively offensive as well, which is consistent with her standpoint as a woman exposed to offensive gender-based comments, when the comments at issue were made by her boss, the City's top attorney, in a professional context, and when her primary job duties included working with that boss on employment discrimination claims.

Quinn further argues that the circumstances of her administrative leave including the visible location of the meeting and the public announcement of her leave contributed to her distress. Dkt. 128 at 19. Quinn's November 18, 2015 workplace complaint alleged that the work environment created by Young and Potter caused her to "lose sleep, lose weight, throw up and suffer anxiety and panic for which [she has] sought medical treatment," "have nightmares about the discriminatory work environment," and feel "physically afraid of Mr. Potter." Dkt. 129-6 at 18–19. There is no indication that Quinn would not testify to these allegations at trial. Therefore, the Court finds that there is some evidence that Potter's comments and conduct were sufficiently severe and pervasive as to alter Quinn's working conditions and that a dispute of fact exists about whether the atmosphere was sufficiently altered to support liability. On this basis, the Court declines to grant summary judgment as to Potter on Quinn's hostile work environment claim.

Regarding the hostile work environment claim against Young, Quinn testified that "[t]here were statements he made and actions that he took that led me to believe he previously was someone that I trusted and relied upon as my supervisor, that at some point in time that changed and he was taking actions against me which sort of culminated in the meeting on November 12th." Dkt. 129-1 at 407. "[A]ny person who aids, abets, encourages, or incites an unfair practice under the WLAD has himself engaged in an unfair practice under the act." *Yousefi v. Delta Electric Motors, Inc.*, No. C13–1632RSL, 2014 WL 4384068, at *3 (W.D. Wash. Sept. 4, 2014). Liability is premised on a showing that "the defendant has engaged in actions for the purpose of encouraging or assisting another to discriminate" and a showing of the defendant's own discriminatory intent. *Id*.

(citing *Rody v. Hollis*, 81 Wn.3d 88, 94–95 (1972)). Quinn's claim against Young is predicated on his failure to report or redress Potter's comments, his allegedly false characterization of a conversation with Quinn, and his conduct around Quinn's administrative leave.

The Court finds that for the purposes of a claim against Young based on aiding and abetting a hostile work environment, Quinn has failed to put forward evidence of Young's discriminatory intent. Regarding the December 2013 comment, Quinn argues in the facts section of her opposition that "Young was informed of the comment in December 2013 shortly after it happened, he took no action at the time, and he later claimed that he was unaware of the statement until spring 2015." Dkt. 128 at 4 (citing Dkt. 129-1 at 267). The cited deposition testimony does not show Young was informed about the comment in 2013 or that he claimed he was unaware of the statement until spring 2015. In deposition, in response to the question "[s]o you did not leave that conversation with Alison Chinn in 2013 and go straight to Ms. Schwabe and tell her, I'm concerned, I heard that Mr. Potter made a comment that I feel is gender-related" Quinn responded "[Chinn] was very afraid that she would be retaliated against by Mr. Potter. She also told Mr. Young, and neither one of us went to HR." Dkt. 129-1 at 267. Young testified that Chinn first told him about the comment in mid October 2014, and on October 31, 2014 he had a conversation with Potter stating that it was critically important that Potter make no further comments of this nature. Dkt. 103-8 at 107–11, 140. Young's testimony, that Chinn told him about the statement in 2014 and he did not go to HR (but did talk to Potter) is consistent with Quinn's cited testimony. The Court concludes that

even considering making an HR report as an alternative to speaking with Potter, this series of events does not contain evidence Young took or failed to take action with discriminatory intent. *Yousefi*, 2014 WL 4384068, at *3.

Regarding the bitch comment, Quinn testified that Young stated he did not hear the comment because it was so common. Dkt. 128 19 (citing Dkt. 129-1 at 407). However, Quinn also testified that in the conversation where she raised the bitch comment with Young, she also raised the wig comment, and Young responded to her concerns about both comments by saying he would talk to Holmes about them. Dkt. 129-1 at 408. While speaking to Holmes about the comments may have been less impactful than speaking to HR, and Young did testify that Quinn "didn't seem assuaged" when he told her on October 14, 2015 that he had talked to Holmes, Dkt. 103-8 at 63, these circumstances do not support an inference that Young intended to encourage Potter. *Yousefi*, 2014 WL 4384068, at *3. There is no evidence that Young's allegedly false characterization of Quinn's mistake was based on her gender. Finally, regarding the circumstances surrounding Quinn's administrative leave, Quinn has simply failed to show, and the Court does not find a reasonable inference suggesting those circumstances create a question of fact that Young harbored discriminatory intent based on gender.

Therefore, the Court grants summary judgment for Young as to Quinn's hostile work environment claim against him.

### 6. Outrage Claim

Potter and Young argue that Quinn's factual basis for an outrage claim does not "remotely approach[] the standard for outrage." Dkt. 134 at 13 (citing *Robinson v*, 539 F.

Supp. 2d at 1316). Quinn argues that evidence supporting Potter and Young's outrageous conduct includes "their making discriminating and harassing comments to their lying about her work performance to their conspiring to hide evidence from investigators." Dkt. 128 at 22.

The Court finds that neither Potter's comments nor Young's response to them are so extreme in degree as to be regarded as atrocious and that reasonable minds could not differ on this question. *Robinson*, 539 F. Supp. 2d at 1332–33. The Court makes the same conclusion about Young's alleged statement to Potter that Quinn had admitted making a mistake. *See id.*

Regarding the circumstances of Quinn's administrative leave, the Court finds a closer question. Regarding this decision, Weber remarked in her report that:

> While this decision at first glance appears 'heavy-handed,' this objectively becomes less so upon consideration of Ms. Quinn's role as an attorney and fiduciary for the City. Mr. Potter and Mr. Young *credibly* testified that there was a 'giant question' as to what Ms. Quinn might be holding back, and what they didn't know, in connection with the subject employment dispute and potential litigation. Their attempts to communicate with Ms. Quinn about this had been rejected, avoided and otherwise unsuccessful. Mr. Potter and Mr. Young *credibly* testified that they had concerns about Ms. Quinn's representation of the City that warranted further investigation. Based upon the entirety of the circumstances, these concerns present as objectively reasonable (albeit ultimately unsubstantiated).

Dkt. 103-7 at 23 (emphasis added).[12] The Court finds this portion of Weber's report to be a helpful summary of facts which are present elsewhere in the record. Critically, Weber's conclusion about the relevant facts around the administrative leave is based on her

---

[12] The Court notes that Potter and Young also quote this portion of Weber's report in the facts section of their motion. Dkt. 102 at 7.

finding that Potter and Young presented credible testimony. Of course, in court, the assessment of witness credibility is for the jury.

Construing these same facts and all reasonable inferences in favor of Quinn, she ended up in a meeting where Holmes had failed to shield her from being the bearer of bad news (about Christie's retention to investigate Potter's conduct relevant to the Lampkin matter) to a volatile Potter and this so distressed her she left the meeting without explanation. Dkt. 128 at 8. A few days later, as she was about to meet with Christie to report on Potter's discriminatory actions, Potter and Young pulled her into a meeting to discuss her own misconduct in a prominent space without a witness of her choice. *Id*. Potter and Young told her she was the subject of an unspecified investigation, "interrogated" her about the meeting she had left, falsely accused her of a legal mistake, and then placed her on immediate administrative leave without explaining the nature or subject of the investigation. *Id*. at 9. They then publicly notified her colleagues and clients that she was on administrative leave, the type of announcement typically reserved for "police shootings or other terminable offenses." *Id*. As previously noted, Quinn alleged these circumstances at least contributed to substantial physical distress. Dkt. 129-6 at 18–19. The Court finds that though it is a close question, even placing a longtime public servant on administrative leave in a manner publicly indicating she had committed a terminable violation primarily on the basis of unfounded speculation that she was colluding with opposing counsel does not constitute conduct "to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Robinson*, 539 F. Supp. 2d at 1332–33.

Therefore, the Court grants summary judgment on Quinn's outrage claim as to Potter and Young.

**D.      The City's Motion for Summary Judgment**

Quinn alleges claims against the City for sex discrimination in violation of 42 U.S.C. § 2000e-2(a), sex discrimination in violation of RCW 49.60.30 & .180, retaliation in violation of 42 U.S.C. § 2000e-17, retaliation in violation of RCW 49.60.180, retaliation for speech on matters of public concern in violation of the First Amendment, outrage, negligent supervision, breach of implied contract, and violation of the right to equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. §1983. Dkt. 1. The City requests that the Court rely on the briefs submitted by the individual defendants for Quinn's claims which are also asserted against the individual defendants. Dkt. 107 at 3.

Regarding Quinn's disparate treatment, hostile work environment, and retaliation claims, the City concedes that "[w]hile [the City] is the only party alleged to have violated Title VII, the same factual record and legal authorities apply because the City's liability would be necessarily predicated on imputed liability for the acts of its managers." Dkt. 107 at 12.

**1.      Disparate Treatment and Hostile Work Environment**

The City takes issue with the factual basis for Quinn's disparate treatment claim based on failure to promote. Dkt. 107 at 12–13. The Court has thoroughly addressed the factual bases for Quinn's claims and determined that Quinn's disparate treatment claim based on failure to promote under the WLAD may be sustained as to Holmes and Potter,

but not as to Young. Therefore, the City is still subject to liability for Holmes and Potter's disparate treatment under the WLAD and under Title VII based on failure to promote.

The Court has found that Quinn has established a sufficient dispute of fact to survive summary judgment as to Potter's liability for creating a hostile work environment and as to Holmes's liability for disparate treatment through the adverse employment action of a hostile work environment. The Court granted summary judgment for Young on Quinn's claim against him for a hostile work environment.

The City cites *Woods v. State of Wash.*, 475 Fed. App'x 111, at *1 (9th Cir. 2012) ("*Woods*") for the proposition that Quinn's administrative leave was not sufficiently severe as to support a claim of disparate treatment because her title and compensation were not impacted. Dkt. 107 at 13–14. The Court disagrees. While impact to title, compensation, or other job status are often cited as examples of adverse employment actions which are sufficiently severe to state a claim for disparate treatment, for the reasons articulated above the Court found that the specific circumstances of Quinn's administrative leave could reasonably constitute an adverse employment action. Therefore, the City may be subject to liability for Potter's actions creating a hostile work environment under the WLAD and Title VII and for Holmes's actions subjecting Quinn to disparate treatment through a hostile work environment under the WLAD and Title VII.

As did Holmes, the City argues that Quinn confirmed in deposition that she is withdrawing her claims of discrimination based on age and national origin. Dkt. 107 at 3. Quinn does not address this contention in her opposition and does not appear to have

advanced these claims. *See* Dkt. 127. Therefore, the Court finds that the City's argument

may be construed as a request for summary judgment on these claims, and Quinn's

failure to advance argument or evidence in support of these claims may be construed as

conceding that they are withdrawn to the extent that they were made. Thus, the Court

grants summary judgment for the City as to Quinn's claims for discrimination only as to

discrimination based on national origin and age.

### 2.     Retaliation

Quinn argues that "[t]he City keeping Ms. Quinn on administrative leave for

nearly four months, with Holmes's collusion, constitutes prima facie retaliation." Dkt.

126 at 18.

The City cites *Woods* for the proposition that Quinn cannot show sufficient

harmful impact to support a claim of retaliation. Dkt. 107 at 13.[13] In *Woods*, regarding a

claim of retaliation under Title VII, the Circuit cited the same standard cited by the

Court—whether the employer's action "might well have dissuaded a reasonable worker

from making or supporting a claim of discrimination." *Woods*, 475 Fed. App'x 111, at

*1. The Court found that Quinn's claims for retaliation under the WLAD against Holmes,

Potter, and Young all survive summary judgment. Therefore, the Court denies summary

judgment for the City as to its potential liability for Holmes, Potter, and/or Young's

retaliatory conduct, whether under Title VII or under the WLAD.

---

[13] While the causation element in a retaliation claim under Title VII is "but-for" causation, a higher burden than the WLAD's "substantial factor" standard, the City does not address or present argument based on this higher standard, so the Court understands the City not to dispute this issue. Dkt. 107 at 12–14.

### 3. First Amendment Claim

Quinn advances the same factual bases for her First Amendment claim in her opposition to the City's motion that she advanced in her opposition to Holmes motion and in her opposition to Potter and Young's motion. *Compare* Dkt. 126 at 21–22 *with* Dkt. 128 at 19–21. The Courts grants summary judgment for Holmes, Potter, and Young as to Quinn's First Amendment claim. Therefore, the Court also grants the City's motion for summary judgment as to Quinn's First Amendment claim.

### 4. Outrage Claim

The City argues that Quinn's outrage claim must fail because the conduct alleged does not meet the legal standard. Dkt. 107 at 4–5. As noted, the Court has found that none of Quinn's claims of outrage against the individual defendants survive summary judgment. Therefore, the City is no longer subject to liability for the tort of outrage committed by its employees and the Court grants summary judgment for the City on that basis.

### 5. Negligent Supervision Claim

The City argues that Quinn cannot establish the first element of a negligent supervision claim, that the defendant acted outside the scope of employment, because her allegations against the individual defendants "are based on the premise that the Defendants were at all times acting within the scope of their employment." Dkt. 107 at 12 (citing *Briggs*, 135 Wn. App. at 966–67); *see also* Dkt. 133 at 8 (citing *S.H.C. v. Lu*, 113 Wn. App. 511, 517 (2002) (citing *Rodriguez v. Perez*, 99 Wn. App. 439, 451 (2000), *rev. denied*, 141 Wn. 2d 1020). Holmes did not raise this issue in his motion or reply. The

only one of the City's cited cases which discusses the meaning of the scope of employment is *Rodriguez*, which explains that the scope of employment is typically a jury question. *Rodriguez*, 99 Wn. App. at 451. In *Rodriguez*, the particular structure of the plaintiff's claims meant an underlying claim had to be established in order to prove negligent supervision, so the court concluded that "no additional cause of action for negligent supervision is necessary." *Id.* The Court finds that the City has failed to establish an analogous set of interlocking claims exists here. The Court previously denied summary judgment for Holmes as to Quinn's claim for negligent supervision against him. Therefore, the Court denies the City's motion for summary judgment as to Quinn's claim for negligent supervision.

### 6.      Breach of Implied Contract Claim

Under Washington law, there are two mechanisms through which an employer's employment policies and procedures can alter an at-will employment relationship: (1) written materials may create an implied contract modifying the at-will relationship, or (2) the employer's written materials promise specific treatment in specific situations, inducing the employee to continue working and not actively seek other employment under a theory of equitable reliance. *Quedado v. Boeing Co.*, 168 Wn. App. 363, 368 (2012) (citing *Duncan v. Alaska USA Fed. Credit Union, Inc.*, 148 Wn. App. 52, 60 (2008)). Quinn brings her claim under the second scenario. Dkt. 126 at 24.

To prove this claim, Quinn must show:

(1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific

situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached.

*Quedado*, 168 Wn. App. at 369 (quoting *Bulman v. Safeway, Inc.*, 144 Wn. 3d 335, 340–41 (2001)). Quinn argues that the City's Municipal Code Chapter 2.69.020 promises City employees will be provided with a "workforce diversity program complaint resolution procedure" "for use by any city employees and applicants for city employment who believe they are being discriminated against or are being harassed by the city in violation of state or federal equal employment opportunity law." Dkt. 126 at 24.

While much of the City's reply appears to conflate the implied contract scenario with the equitable reliance scenario, the City is correct that Quinn has failed to put forward evidence of how she relied to her detriment on the City's promise to provide a workforce diversity program complaint resolution procedure. Quinn argues that the City concedes that Quinn maintains she relied on this promise, but that still does not absolve Quinn of the obligation to articulate *how* she relied on the promise, whether through forgoing a job opportunity or making a decision not to seek other employment. Moreover, the only evidence Quinn cites to support her argument that the City breached its promise is testimony from Holmes's deposition responding to a question about the City's policies at the time he was the City's Economic Development Director, dating to a time period well before the facts at bar. *See* Dkt. 126 at 24 (citing Dkt. 129-2 at 43). Finding Quinn has failed to put forward evidence of at least the second and third required elements of her theory of recovery, the Court grants summary judgment for the City on Quinn's implied contract claim under an equitable reliance theory.

### 7. Equal Protection Claim

"To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). Quinn argues that she has "produced copious evidence that Holmes, Potter, and Young intentionally discriminated against her as a woman under color of law in refusing to promote her and in retaliating against her for reporting gender discriminatory conduct." Dkt. 126 at 25. In order to survive summary judgment on her gender discrimination or retaliation for opposition to gender-based retaliation claim under § 1983, Quinn must submit sufficient evidence to create a genuine dispute of material fact on two elements: (1) that she was subject to gender discrimination and/or retaliation for reporting gender discriminatory conduct, and (2), that the discrimination and/or retaliation was intentional. *Flores*, 324 F.3d at 1134.

The City argues without authority that Quinn cannot state a claim under the Equal Protection Clause of the Fourteenth Amendment because she "cannot point to any state law or local government ordinance that interferes with or subjects her to differential treatment, a hostile work environment, or retaliation." Dkt. 107 at 6. That is not the standard.

In *Lindsey v. Shalmy*, 29 F.3d 1382, 1384 (9th Cir. 1994), the Ninth Circuit denied qualified immunity to a supervisor in a county department of business licenses who allegedly treated an employee with hostility, denied her a promotion, and unfavorably altered her job responsibilities on the basis of her gender. The Circuit held that a

reasonable official in 1988 would have understood that "unfavorably altering [the plaintiff's] job assignments, preparing unfavorable performance evaluations of her work and displaying a hostile attitude towards her causing others in the department to ostracize her, violated her clearly established federal constitutional rights," provided that the official took those actions against the plaintiff based on her gender. *Id.* at 1386. On the same facts which caused the Court to deny summary judgment against Holmes and Potter for disparate treatment based on gender as to failure to hire or as to hostile work environment based on gender, the Court finds that Quinn could bring a claim for gender discrimination under the Equal Protection Clause. Therefore, the Court denies the City's motion as to Quinn's Equal Protection claim.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Holmes's motion, Dkt. 100, Potter and Young's motion, Dkt. 102, and the City's motion, Dkt. 107, are each **GRANTED in part and DENIED in part** as set forth herein.

Dated this 21st day of August, 2019.

BENJAMIN H. SETTLE
United States District Judge